**NORTH CAROLINA ALLIANCE FOR TRANSPORTATION REFORM, INC.; and Friends of Forsyth County, an unincorporated association; Plaintiffs,**

v.

**UNITED STATES DEPARTMENT OF TRANSPORTATION; Rodney E. Slater, Secretary of United States Department of Transportation; Federal Highway Administration; Kenneth R. Wykle, Administrator, Federal High-** way Administration; Nicholas L. Graf, Division Administrator, Federal Highway Administration; North Carolina Department of Transportation; and E. Norris Tolson, Secretary, North Carolina Department of Transportation; Defendants.

No. 1:99CV00134.

United States District Court, M.D. North Carolina.

June 4, 2001.

Marsh Smith, Cunningham, Dedmond, Petersen & Smith, Southern Pines, NC, Bruce J. Terris, Sarah A. Adams, Demian A. Schane, Terris, Pravlik & Millian, LLP, Washington, DC, for Plaintiffs.

Gill P. Beck, Office of U.S. Attorney, Greensboro, NC, for Defendants.

Elizabeth Leonard McKay, N.C. Department of Justice, Attorney General's Office, Raleigh, NC, for North Carolina Dept. of Transp. and E. Norris Tolson.

## MEMORANDUM OPINION

BULLOCK, District Judge.

This action began on February 18, 1999, when Plaintiffs, North Carolina Alliance for Transportation Reform, Inc. and Friends of Forsyth County, filed a complaint against the United States Department of Transportation ("USDOT"); Rodney E. Slater, the Secretary of USDOT; the Federal Highway Administration ("FHWA"); Kenneth R. Wykle, the Administrator of FHWA; and Nicholas L. Graf, the Division Administrator of FHWA (collectively "Federal Defendants"). Also named in the complaint were the North Carolina Department of Transportation ("NCDOT") and E. Norris Tolson, the Secretary of NCDOT (collectively "State Defendants" and collectively with Federal Defendants "Defendants").[1] In the complaint, Plaintiffs alleged that the construction of the Western Section of the Winston–Salem Northern Beltway (the "Western Section") violated the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq.* and the North Carolina Environmental Policy Act ("NCEPA"), N.C. Gen.Stat. § 113A–1 *et seq.* On June 21, 1999, the parties filed a joint motion for an order of dismissal. The court entered an order of dismissal on June 29, 1999. Now pending before the court is Plaintiffs' motion for an award of attorney's fees and expenses. For the following reasons, the court will grant Plaintiffs' motion.

## BACKGROUND

In 1989, the North Carolina General Assembly passed the North Carolina Highway Trust Fund (the "Trust Fund").[2] The Trust Fund designated seven urban areas around which highway loops would be constructed. Winston–Salem, North Carolina was one of the urban areas designated by the Trust Fund. The construction of the Winston–Salem Northern Beltway was the subject of the litigation giving rise to this claim for attorney's fees and expenses.

On June 24, 1992, NCDOT published a draft environmental impact statement ("DEIS") for the Western Section.[3] On March 29, 1996, NCDOT published the final environmental impact statement ("FEIS"). On May 6, 1996, the Raleigh Division of FHWA submitted the record of decision ("ROD")[4] to FHWA's Regional

1. David McCoy has replaced E. Norris Tolson as Secretary of NCDOT since commencement of the action.

2. N.C. Gen.Stat. § 136–175 *et seq.* (1999).

3. An environmental impact statement is a detailed written statement required by section 102(2)(C) of NEPA. *See* 40 C.F.R. § 1508.11. The National Environmental Policy Act requires the preparation of an environmental impact statement for any "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C).

4. The record of decision is a "concise public record" which must 1) state what the agency decision was; 2) identify all alternatives considered by the agency in reaching its decision; and 3) state whether all practicable means to avoid or minimize environmental harm from the alternative selected have been adopted. 40 C.F.R. § 1505.2. Under federal regulations, the record of decision may not be approved until at least thirty (30) days after publication of notice in the Federal Register of the filing of a final environmental impact statement with the Environmental Protection Agency. 40 C.F.R. § 1506.10(b); 23 C.F.R. § 771.127(a). This thirty day period allows the public and other agencies to comment on

Administrator for approval of the project. One day later, on May 7, 1996, FHWA's Regional Administrator issued the ROD. Issuance of the ROD represented final agency action on the Western Section project and completed the NEPA process. By issuing the ROD, Federal Defendants effectively approved the project and accepted the environmental impact statement prepared for the project. The day after issuance of the ROD, May 8, 1996, FHWA announced that the Transportation Improvement Program for the Winston–Salem metropolitan area ("Forsyth County's TIP") no longer conformed with the requirements of the Clean Air Act. As a result, federal agencies could neither approve nor fund any Forsyth County transportation projects that had not already completed the NEPA process. Under a regulatory provision in place at the time, however, funding for the Western Section was permitted to continue because the NEPA process had been completed (the ROD had been issued) before Forsyth County's TIP fell out of conformity with the Clean Air Act.[5] On October 2, 1996, Forsyth County's TIP was found again to conform with the Clean Air Act.

On February 18, 1999, Plaintiffs filed a complaint alleging that the final environmental impact statement prepared for the Western Section was inadequate and violated NEPA and NCEPA. In their complaint, Plaintiffs sought: 1) a declaratory judgment that Defendants violated NEPA and NCEPA; 2) a mandatory injunction directing Defendants to comply with the provisions of NEPA and NCEPA; 3) an order vacating the May 7, 1996, record of decision which approved the final environmental impact statement and construction of the proposed beltway; 4) and an injunction prohibiting defendants from proceeding with site preparation, construction, the issuance of revenue bonds, right of way acquisitions, or any other irrevocable actions related to the building of the proposed Beltway until the violations of NEPA and NCEPA had been corrected. (See Pls'. Compl. [Doc. # 1] at ¶ 4).

On March 2, 1999, the Court of Appeals for the District of Columbia Circuit decided *Environmental Def. Fund v. EPA*, 167 F.3d 641 (D.C.Cir.1999) [hereinafter *EDF* ].[6] In that case, the court struck down certain EPA regulations. Among the regulations struck down was 40 C.F.R. § 93.102(c), known as the "grandfather" rule, which allowed projects to receive federal funding in the absence of a currently conforming TIP as long as the project was part of a conforming plan at the time of its approval. See *EDF*, 167 F.3d at 649. The *EDF* Court held that the grandfather rule violated the Clean Air Act and that only projects located in an area with a currently conforming TIP were eligible to receive federal funds. *Id.* On April 4, 1999, the TIP for Forsyth County again lapsed into non-conformity with the Clean Air Act. Due to the ruling in *EDF*, Forsyth County's lapse of conformity meant that the Western Section could not receive any federal funds until the TIP was again brought into conformity with the Clean Air Act.

the FEIS prior to agency approval of the proposed project. The issuance of an ROD represents final agency action on a project and equates to approval of the FEIS for the project.

5. As discussed below, this regulatory provision, 40 C.F.R. § 93.102(c), was subsequently invalidated by the Court of Appeals for the District of Columbia Circuit in *Environmental*

*Defense Fund v. EPA*, 167 F.3d 641 (D.C.Cir. 1999).

6. Under the provisions of the Clean Air Act, the Court of Appeals for the District of Columbia Circuit has exclusive jurisdiction for review of challenges to nationally applicable EPA regulations issued pursuant to the Clean Air Act. See 42 U.S.C. § 7607(b)(1).

On April 15, 1999, Nicholas Graf ("Graf"), the Administrator of the North Carolina Division of FHWA, notified NCDOT that FHWA had decided to "reopen the NEPA process to consider whether new or supplemental analysis and documentation are warranted on the [Western Section] project." (Fed. Defs.' Mem. in Supp. of Mot. to Dismiss [Doc. # 10], Ex. A–1). This decision to reopen the NEPA process was made "because of" the lawsuit instituted by Plaintiffs, the *EDF* decision, and Forsyth County's April 4, 1999, lapse into non-conformity with the Clean Air Act. *Id.* By reopening the NEPA process FHWA effectively withdrew the previously issued ROD.

With the reopening of the NEPA process, Plaintiffs' action to enjoin Defendants became moot. On June 21, 1999, the parties filed a joint motion for an order of dismissal. The court entered an order of dismissal on June 29, 1999. Thereafter, on August 27, 1999, Plaintiffs filed this motion for an award of attorney's fees and expenses. In a previous opinion related to Plaintiffs' motion for attorney's fees and expenses, this court concluded that the motion is properly before the court for consideration. *See North Carolina Alliance for Transp. Reform, Inc. v. United States Dep't of Transp.,* 104 F.Supp.2d 599 (M.D.N.C.2000). Plaintiffs seek attorney's fees and expenses from Federal Defendants under Sections 2412(b) and 2412(d) of the Equal Access to Justice Act ("EAJA")[7] and from State Defendants under Section 6–19.1 of the North Carolina General Statutes ("N.C.G.S. § 6–19.1").

### ANALYSIS

#### I. *Prevailing Party Status*

 Each of the statutes under which Plaintiffs seek attorney's fees and ex-

penses provides that such an award is available only if Plaintiffs are found to be "prevailing" *See* 28 U.S.C. § 2412(b), (d); N.C. Gen.Stat. § 6–19.1. Plaintiffs satisfy this requirement. The party seeking attorney's fees bears the burden of proving that it was the prevailing party. *See Reich v. King Plumbing & Heating Contractor, Inc.,* 98 F.3d 147, 150 (4th Cir. 1996); *see also House v. Hillhaven, Inc.,* 105 N.C.App. 191, 195–96, 412 S.E.2d 893, 896 (1992). In their complaint filed February 18, 1999, Plaintiffs sought: (1) a declaratory judgment that Defendants violated NEPA and NCEPA; (2) a mandatory injunction directing Defendants to comply with the provisions of NEPA and NCEPA; (3) an order vacating the May 7, 1996, record of decision which approved the final environmental impact statement and construction of the proposed beltway; and (4) an injunction prohibiting Defendants from proceeding with site preparation, construction, the issuance of revenue bonds, right of way acquisitions, or any other irrevocable actions related to the building of the proposed Western Section until the violations of NEPA and NCEPA had been corrected. (Pls.' Compl. [Doc. # 1] at ¶ 4).

On April 15, 1999, the FHWA sent a letter to NCDOT which stated, in relevant part:

Dear Secretary Tolson:

As you know, the recent lawsuit filed in the United States District Court for the Middle District of North Carolina alleged deficiencies in the Final Environmental Impact Statement (FEIS) for the Western Section of the Winston–Salem Bypass....

The Winston–Salem Bypass project was included in the Long Range Trans-

---

7. 28 U.S.C. § 2412.

portation Plan (LRTP) and Transportation Improvement Program (TIP) for the Winston–Salem metropolitan area. That plan and program previously demonstrated conformity under the Clean Air Act. However, on April 4, 1999, the Winston–Salem metropolitan area lapsed conformity and does not currently have a conforming LRTP and TIP.

... In accordance with [*Environmental Def. Fund v. EPA,* 167 F.3d 641 (D.C.Cir.1999)], we are prohibited from approving further activities on the Western Section of the Winston–Salem Bypass until a new conformity finding is made on an updated LRTP and TIP.

*Because of these developments,* I have decided to reopen the NEPA process to consider whether new or supplemental analysis and documentation are warranted on the Winston–Salem Bypass project....

Therefore, we will not grant further approvals on the Winston–Salem Bypass project until after we have completed any new or supplemental environmental analysis and documentation; the Bypass project has come from a currently conforming LRTP and TIP for the Winston–Salem metropolitan area; and we have made a new final decision to proceed with the project.

(Federal Defs.' Mem. in Supp. of Mot. to Dismiss [Doc. # 10], Ex. A–1)(emphasis added). On June 21, 1999, the parties filed a joint motion to dismiss pursuant to Rule 41(a)(2) of the Federal Rules of Civil Procedure. On June 29, 1999, this court issued its Order of Dismissal, which stated, in relevant part:

1. Plaintiff's complaint is dismissed without prejudice;

2. The Court determines, based on the representations of the federal defendants, that the final agency action which was challenged in this case has been superseded and therefore shall no longer be relied upon for any actions by defendants;

3. Federal defendants shall not grant any further approvals, enter into any contracts, or provide any funds relating to the acquisition of property or construction of the Western Section of the Winston–Salem Beltway (hereafter "Bypass Project") until the new environmental analysis and documentation process has been completed, a conforming Long Range Transportation Plan and Transportation Improvement Program for the Winston–Salem metropolitan area have been approved, and federal defendants issue a new Record of Decision pursuant to applicable federal law for the Bypass Project;

4. State defendants shall not take any irrevocable actions relating to construction, right-of-way acquisitions, or negotiations for right-of-way acquisitions, in furtherance of the Bypass Project until the conditions set forth in paragraph 3 above have been met.

*North Carolina Alliance for Transp. Reform v. United States Dep't. of Transp.,* No. 99CV134 (M.D.N.C. June 29, 1999) (Order of Dismissal, [Doc. # 21]).

In *Hensley v. Eckerhart,* 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983), a case brought pursuant to 42 U.S.C. § 1988, the Supreme Court defined a "prevailing party" as one who succeeded "on any significant issue in litigation which achieves some of the benefit the parties sought in bringing suit." *Id.* at 433, 103 S.Ct. 1933. In *Farrar v. Hobby,* 506 U.S. 103, 113 S.Ct. 566, 121 L.Ed.2d 494 (1992), another case for attorney's fees under 42 U.S.C. § 1988, the Supreme Court further clarified prevailing party status:

[T]o qualify as a prevailing party, a civil rights plaintiff must obtain at least some relief on the merits of his claim. The

plaintiff must obtain an enforceable judgment against the defendant from whom fees are sought, or comparable relief through a consent decree or settlement. Whatever relief the plaintiff secures must directly benefit him at the time of the judgment or settlement. Otherwise the judgment or settlement cannot be said to "affec[t] the behavior of the defendant toward the plaintiff." *Farrar*, 506 U.S. at 111, 113 S.Ct. 566 (internal citations omitted).[8]

■ In *S–1 and S–2 By and Through P–1 and P–2 v. State Bd. of Educ. of North Carolina*, 6 F.3d 160 (4th Cir.1993) (Wilkinson, J., dissenting), *adopted as majority opinion*, 21 F.3d 49 (4th Cir.1994) (en banc),[9] the Fourth Circuit interpreted *Farrar* as rejecting the "catalyst theory" when determining prevailing party status under 42 U.S.C. § 1988.[10] The Fourth Circuit held that "[t]here is no way … that *Farrar* and a broad 'catalyst theory' of attorneys' fees recovery can be recon-

ciled." *S–1 and S–2*, 6 F.3d at 168–69. Rather, the Fourth Circuit concluded that to be deemed a prevailing party, a party seeking attorney's fees "must succeed on the merits of a claim." *Id.* at 170. According to the Fourth Circuit, the determinative factor in finding a plaintiff to be a prevailing party is whether a "material alteration of the legal relationship between the parties" entitles the plaintiff to enforce "a judgment, consent decree, or settlement against the defendant." *Id.*[11] "In other words, success must be something buttressed by a court's authority." *Id.*

As indicated in the April 15, 1999, letter from FHWA to NCDOT, the lawsuit brought by Plaintiffs was a factor contributing to Defendants decision to withdraw the record of decision. This point is also clearly made in an internal memorandum drafted by an engineer with the North Carolina Department of Transportation, which states in part:

8. Much of the case law regarding the concept of a prevailing party under the EAJA has arisen in connection with actions brought under 42 U.S.C. § 1988, which provides for awards of attorney's fees to the prevailing party as part of costs in cases arising under the Civil Rights Act. *See, e.g., Clark v. Maryland Hospitality, Inc.*, 28 F.3d 420 (4th Cir. 1994). The Supreme Court has approved of the application of case law arising under various statutory fee shifting schemes to any situation in which a fee award is authorized by Congress to a "prevailing party." *See Hensley*, 461 U.S. at 433 n. 7, 103 S.Ct. 1933 (stating that "[t]he standards set forth in this opinion are generally applicable in all cases in which Congress has authorized an award of fees to a 'prevailing party' ").

9. For simplicity of citation, the court will cite only to the dissenting opinion of Judge Wilkinson rather than both to Judge Wilkinson's dissenting opinion and to the subsequent *en banc* opinion of the Fourth Circuit adopting Judge Wilkinson's dissent.

10. The catalyst theory is a doctrine applied in actions for attorney's fees by some federal courts. Under the theory, a plaintiff is granted prevailing party status when the plaintiff's lawsuit acts as a catalyst in prompting the defendant to take action to meet plaintiff's claims despite the lack of formal judgment in the case. *See Foreman v. Dallas County, Texas*, 193 F.3d 314, 319 (5th Cir.1999).

11. In *Buckhannon Bd. and Care Home, Inc. v. West Va. Dep't of Health and Human Resources*, —— U.S. ——, 121 S.Ct. 1835, 149 L.Ed.2d 855 (2001), the Supreme Court affirmed the Fourth Circuit's rejection of the "catalyst theory." The Court stated:
 A defendant's voluntary change in conduct, although perhaps accomplishing what the plaintiff sought to achieve by the lawsuit, lacks the necessary judicial imprimatur on the change. Our precedents thus counsel against holding that the term "prevailing party" authorizes an award of attorney's fees without a corresponding alteration in the legal relationship of the parties.
 *Id.*, 121 S.Ct. at 1840.

NCDOT is currently re-evaluating the Environmental Impact Statement (EIS) for R–2247 (Western Section of the Winston–Salem Beltway, from U.S. 158 to U.S. 52). *As a result of the lawsuit* filed against NCDOT by Friends of Forsyth and N.C. Alliance for Transportation Reform, FHWA rescinded the Record of Decision.

(Pls.' Mem. in Opp'n to Fed. Defs.' Mem. Regarding Substantial Justification [Doc. # 63], Ex. 1 at 2)(emphasis added). The memorandum also states that "[t]he purpose of the re-evaluation is two-fold: (1) to address the alleged deficiencies of the EIS as outlined in the lawsuit, and (2) to determine if there exists any reasonable and feasible alternatives that were not evaluated in the EIS." *Id.*

In addition to this evidence that the lawsuit brought by Plaintiffs played a significant part in Defendants' decision to reopen the environmental analysis process, the Order of Dismissal issued by this court granted Plaintiffs a substantial portion of the relief they requested in their complaint. Specifically, the Order of Dismissal, which Plaintiffs were entitled to enforce against Defendants, precluded Defendants from granting any further approvals, entering into any contracts, or providing any funds relating to the acquisition of property or construction of the Western Section until the new environmental analysis and documentation process had been completed. (Order of Dismissal, [Doc. # 21] at ¶¶ 3, 4). The Order of Dismissal embodies a significant portion of the relief Plaintiffs sought in filing the civil action in the first place. Therefore, Plaintiffs are prevailing parties. Having found Plaintiffs to be prevailing, the court must consider the other requirements of the various statutes under which Plaintiffs seek fees and expenses.

## II. *28 U.S.C. § 2412(b)*

▮▮ Plaintiffs seek attorney's fees and expenses from Federal Defendants under Section 2412(b) of the Equal Access to Justice Act. This Section provides in part that:

Unless expressly prohibited by statute, a court may award reasonable fees and expenses of attorneys ... to the prevailing party in any civil action brought by or against the United States or any agency.... The United States shall be liable for such fees and expenses to the same extent that any other party would be liable under the common law or under the terms of any statute which specifically provides for such an award.

28 U.S.C. § 2412(b). The Fourth Circuit has interpreted § 2412(b) to allow an award of fees and expenses in cases where the government has acted in bad faith. *See, e.g., Hyatt v. Shalala,* 6 F.3d 250, 254 (4th Cir.1993); *Sullivan v. Sullivan,* 958 F.2d 574, 577 n. 8 (4th Cir.1992). A finding of bad faith is a factual determination within the discretion of the district court. *See Hyatt,* 6 F.3d at 255. The burden is on the plaintiff to show bad faith conduct by the defendant. *United States v. Ford,* 737 F.2d 1506, 1510 (9th Cir.1984). Bad faith conduct may be found when an agency "confronted with a clear statutory or judicially-imposed duty towards another, is so recalcitrant in performing that duty that the injured party is forced to undertake otherwise unnecessary litigation to vindicate plain legal rights." *American Hosp. Ass'n v. Sullivan,* 938 F.2d 216, 220 (D.C.Cir.1991) (citations omitted).

▮▮ Plaintiffs claim that Federal Defendants acted in bad faith by issuing an ROD for a project that Federal Defendants knew to have an inadequate final environmental impact statement. According to Plaintiffs, two factors provide evidence that Federal Defendants' knew that the

FEIS for the Western Section was inadequate at the time the record of decision issued: the short time between submission and issuance of the ROD and FHWA's eventual decision to re-open the entire NEPA process rather than re-opening only the air quality analysis.

FHWA's Regional Administrator issued the record of decision only one day after its submission. The Raleigh Division of FHWA submitted the ROD to the FHWA Regional Administrator on May 6, 1996. The Regional Administrator issued the ROD on May 7, 1996. Plaintiffs contend that by considering the ROD for only one day Federal Defendants inadequately reviewed the Western Section's environmental analysis before granting approval of the project. According to Plaintiffs, the one-day consideration of the ROD alone constitutes a procedural violation of NEPA and amounts to bad-faith conduct on the part of Federal Defendants. This is not the only evidence of FHWA's inadequate consideration of the environmental analysis for the Western Section, though. The issuance of the ROD came one day prior to FHWA's announcement on May 8, 1996, that Forsyth County's TIP no longer conformed with Clean Air Act requirements. Under regulatory provisions applicable at the time, a project located in an area in conformity with the Clean Air Act when the project was approved could continue to receive federal funds even if the area subsequently fell out of conformity with the Clean Air Act.[12] Therefore, by issuing the ROD prior to the announcement of non-conformity, Federal Defendants ensured that the Western Section project would be eligible to receive funding even though Forsyth County was to fall into non-conformity with the Clean Air Act the very

next day. Plaintiffs argue that "[i]t is inconceivable that FHWA was not aware of the impending announcement of non-conformity on May 7, 1996, the day it approved the ROD." (Pls.' Mem. in Supp. of Their Mot. for an Award of Attys.' Fees and Expenses [Doc. # 25] at 7). Plaintiffs further contend that the sequence of events, submission of the ROD on May 6, issuance of the ROD on May 7, and announcement of non-conformity on May 8, inexorably leads to the conclusion that Federal Defendants rushed the issuance of the ROD in an attempt to avoid the funding freeze that would commence upon the announcement of non-conformity. In hurrying through the approval process, Plaintiffs claim that Federal Defendants issued an ROD for a project that Federal Defendants knew to have serious flaws in its final environmental impact statement.

Plaintiffs also argue that Federal Defendants' decision to reopen the entire NEPA process in April 1999 was an implicit admission that the environmental impact statement for the Western Section was inadequate at the time the ROD originally issued. Plaintiffs contend that the only aspect of the environmental impact statement that could have changed significantly between the initial issuance of the ROD in May 1996 and the reopening of the NEPA process in April 1999 was the air quality analysis. Nevertheless, when Federal Defendants reopened the NEPA process in April 1999, they opted to review the entire environmental analysis rather than focusing only on the air quality analysis.

Federal Defendants dispute Plaintiffs' characterization of the events surrounding the issuance of the ROD. Federal Defendants argue that FHWA had "extensive involvement" throughout the NEPA pro-

---

12. This regulation, known as the "grandfather" rule, was discussed more fully in the "Facts" section of the opinion.

cess. (Fed. Defs.' Reply Mem. Regarding the Issue of Substantial Justification [Doc. # 65] at 6). According to Federal Defendants, FHWA and NCDOT worked together over a matter of years to prepare the FEIS for the Western Section. Consequently, Federal Defendants argue that at the time the Raleigh Division of FHWA submitted the ROD to the FHWA regional administrator, the agency was already familiar with the environmental analysis that had been undertaken. Federal Defendants also contend that "[a]bsent significant adverse comments, the decision maker, who has been intimately involved in the NEPA process, can approve the ROD without further extensive deliberation beyond that which has already occurred." (Fed. Defs.' Reply Mem. Regarding the Issue of Substantial Justification [Doc. # 65] at 5–6).

Other than general claims of participation, Federal Defendants have provided the court with no specific information as to the part they played in preparing the FEIS. In addition, according to Federal Defendants' position regarding the Regional Administrator's role in issuing the ROD, review of the ROD and final agency action on a project is essentially a perfunctory matter unless there are "significant adverse comments." (Fed. Defs.' Reply Mem. Regarding the Issue of Substantial Justification [Doc. # 65] at 6). Federal Defendants cite no authority for this proposition. Even if it were correct, however, Federal Defendants' own brief indicates that such an expedited consideration of the ROD would not have been undertaken in good faith in this case. According to Federal Defendants, "[n]umerous comments were received" in response to the FEIS.

(Fed. Defs.' Reply Mem. Regarding the Issue of Substantial Justification [Doc. # 65] at 6). Despite these numerous comments, FHWA's Regional Administrator issued the ROD only one day after its submission. NEPA requires that an agency take a "hard look" at the environmental consequences of a proposed major action. *Kleppe v. Sierra Club*, 427 U.S. 390, 410 n. 21, 96 S.Ct. 2718, 49 L.Ed.2d 576 (1976). The cursory one-day review undertaken by FHWA, which was the final agency action on a project of considerable magnitude and controversy, indicates a complete disregard for this "hard look" requirement. When considered in combination with the non-conformity announcement on the next day, Federal Defendants' one-day review of the ROD constitutes bad faith in performing a statutorily imposed duty. The decision to reopen the entire NEPA process, which alone would not indicate bad faith conduct, provides further evidence that Federal Defendants would not have issued the ROD so rapidly had they undertaken a more deliberate consideration of the environmental analysis for the Western Section. As a result, the court finds attorney's fees and expenses warranted under 28 U.S.C. § 2412(b).

### III. *28 U.S.C. § 2412(d)(1)(A) and N.C.G.S. § 6–19.1*

In addition to satisfying the requirements of 28 U.S.C. § 2412(b), Plaintiffs also meet the statutory requirements for fees and expenses under Section 2412(d)(1)(A) of the Equal Access to Justice Act and Section 6–19.1 of the North Carolina General Statutes.[13] Section 2412(d)(1)(A) of the Equal Access to Jus-

---

**13.** Having already found attorney's fees and expenses available under 28 U.S.C. § 2412(b), analysis under 28 U.S.C. § 2412(b)(1)(D) is not mandatory. However, since the court must undertake a further analysis to deter-

mine State Defendants' liability for attorney's fees and because Defendants have reopened the NEPA process, the court will include 28 U.S.C. § 2412(b)(1)(D) in its discussion.

tice Act states that "[e]xcept as otherwise specifically provided by statute, a court shall award to a prevailing party other than the United States fees and other expenses ... unless the court finds that the position of the United States was substantially justified or that special circumstances make an award unjust." 28 U.S.C. § 2412(d)(1)(A).

North Carolina General Statutes § 6–19.1 provides:

> In any civil action, ... brought by the State or brought by a party who is contesting State action pursuant to G.S. 150B–43 or any other appropriate provisions of law, unless the prevailing party is the State, the court may, in its discretion, allow the prevailing party to recover reasonable attorney's fees to be taxed as court costs against the appropriate agency if:
>
> (1) The court finds that the agency acted without substantial justification in pressing its claim against the party; and
>
> (2) The court finds that there are no special circumstances that would make the award of attorney's fees unjust.

N.C. Gen.Stat. § 6–19.1. Because of the similarities in the language and requirements of the federal and state provisions, the state courts, when construing N.C.G.S. § 6–19.1, have looked to the federal courts' interpretation of 28 U.S.C. § 2412(d)(1)(A). *See Crowell Constructors, Inc. v. State ex rel. Cobey,* 342 N.C. 838, 843–44, 467 S.E.2d 675, 679 (1996). Accordingly, this court will address Plaintiffs' entitlement to attorney's fees and expenses under 28 U.S.C. § 2412(d)(1)(A) and N.C.G.S. § 6–19.1 under the same standards.

### A. *Issue of substantial justification*

 Plaintiffs are entitled to fees and expenses under 28 U.S.C. § 2412(d)(1)(A) and N.C.G.S. § 6–19.1 only if the position taken by Defendants was not "substantially justified" and special circumstances do not make an award of attorney's fees unjust.[14] 28 U.S.C. § 2412(d)(1)(A); N.C. Gen.Stat. § 6–19.1. The "position" taken by Defendants, as defined in the Equal Access to Justice Act, includes the position taken by Defendants in the civil action and "the action or failure to act by the agency upon which the civil action is based." 28 U.S.C. § 2412(d)(2)(D).[15] Under the Equal Access to Justice Act, "substantially justified" means "justified in substance or in the main-that is, justified to a degree that could satisfy a reasonable person." *Pierce v. Underwood,* 487 U.S. 552, 565, 108 S.Ct. 2541, 101 L.Ed.2d 490 (1988); *see also Whiteco Industries, Inc. v. Harrelson,* 111 N.C.App. 815, 819, 434 S.E.2d 229, 233 (1993) (applying same standard to an award of attorney's fees under N.C.G.S. § 6–19.1). Defendants bear the burden of proving by a preponderance of the evidence that their positions were substantially justified. *See Reich* 98 F.3d at 150–51; *see also Whiteco Industries,* 111 N.C.App. at 819, 434 S.E.2d at 233.

---

**14.** State Defendants argue that N.C.G.S. § 6–19.1 provides for attorney's fees but not for expenses. While the plain language of the statute mentions only fees, the statute has been construed to include expenses as well. *See Walker v. North Carolina Coastal Resources Comm'n,* 124 N.C.App. 1, 12, 476 S.E.2d 138, 145 (1996).

**15.** N.C.G.S. § 6–19.1 provides for fees if a State agency acts without substantial justifica-

tion "in pressing its claim against the party." Like Section 2412(d)(1)(A) of the EAJA, this includes agency action prior to litigation. *See Crowell Constructors, Inc. v. State ex rel. Cobey,* 342 N.C. 838, 844, 467 S.E.2d 675, 679 (1996) ("[W]e ... require the agency to demonstrate that its position, *at and from the time of its initial action,* was rational and legitimate.") (emphasis added).

Plaintiffs claim that Federal Defendants were not substantially justified in considering the ROD for only one day prior to issuance. Since the court has already found that Plaintiffs carried the burden of showing bad faith conduct based on this allegation, *a fortiori* Federal Defendants were not substantially justified in issuing the ROD in the manner they did. Plaintiffs also argue that Defendants were not substantially justified in their production and approval of an inadequate final environmental impact statement for the Western Section. This allegation requires the court to examine whether the FEIS complies with NEPA and NCEPA.[16]

■ The purposes for NEPA are twofold: to ensure that agencies will carefully consider detailed information concerning significant environmental impacts and to guarantee that the relevant information will be made available to the public. *See Robertson v. Methow Valley Citizens Council,* 490 U.S. 332, 349, 109 S.Ct. 1835, 104 L.Ed.2d 351 (1989). NEPA seeks to accomplish these goals by requiring agencies to disclose the environmental effects associated with a proposed project. NEPA forces disclosure by requiring agencies to issue an environmental impact statement, a document which must include a detailed discussion of:

(i) the environmental impact of the proposed action,

(ii) any adverse environmental effects which cannot be avoided should the plan be implemented,

(iii) alternatives to the proposed action,

(iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and

(v) irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

42 U.S.C. § 4332(C). Although NEPA "sets forth procedural mechanisms to ensure proper consideration of environmental concerns, it does not mandate particular substantive results." *See Carmel–by–the–Sea v. United States Dep't of Transp.,* 123 F.3d 1142, 1150 (9th Cir.1997). NEPA focuses on procedure. It requires that an agency take a "hard look" at the environmental consequences of a proposed action, not that the agency select the most environmentally benign alternative. *See Natural Resources Def. Council, Inc. v. Morton,* 458 F.2d 827, 838 (D.C.Cir.1972).

■ NEPA contains no independent private right of action, but the Administrative Procedure Act ("APA") expressly provides a right to judicial review of all final agency actions, including NEPA decisions. *See* 5 U.S.C. § 702 ("A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial relief thereof."); *see also* N.C. Gen.Stat. § 150B–43 (providing an analogous right to judicial review under North Carolina law). The court's scope of review under the APA is to determine whether the chal-

---

**16.** Plaintiffs brought this action against State Defendants under NCEPA, not NEPA. The North Carolina Court of Appeals has stated, however, that "to the extent that the federal environmental law is relied upon to meet the requirements of NCEPA, the federal requirements are by reference enforceable against North Carolina agencies as state law." *See Orange County v. North Carolina Dep't of* *Transp.,* 46 N.C.App. 350, 368, 265 S.E.2d 890, 903 (1980). For this reason, in determining whether State Defendants were substantially justified in preparing the FEIS the court will consider NEPA's implementing regulations. Furthermore, for simplicity of language, the court will refer primarily to NEPA rather than to both NEPA and NCEPA when discussing the adequacy of the FEIS.

lenged agency action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or whether the agency undertook action "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (D). When reviewing agency action under the APA, the court cannot "substitute its judgment for that of the agency." *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971), *abrogated on other grounds, Califano v. Sanders,* 430 U.S. 99, 97 S.Ct. 980, 51 L.Ed.2d 192 (1977); *see also Kleppe v. Sierra Club,* 427 U.S. 390, 410 n. 21, 96 S.Ct. 2718, 49 L.Ed.2d 576 (1976) ("The only role for a court is to insure that the agency has taken a 'hard look' at environmental consequences; it cannot interject itself within the area of discretion of the executive as to the choice of the action to be taken."). Nevertheless, deference to agency expertise does not "shield [an agency] from a thorough, probing, in-depth review." *Overton Park,* 401 U.S. at 415, 91 S.Ct. 814. An agency violates the APA (and in this case NEPA) if it relies on factors Congress did not intend for it to consider, fails to examine an important aspect of the problem, offers an explanation for its decision that contradicts the evidence before the agency, or is so implausible that it cannot be attributed to a product of agency expertise. *See Motor Vehicle Mfrs. Ass'n v. State Farm Mut.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983).

 While the burden of proof under the APA, and consequently under NEPA, is on the plaintiff, the EAJA places the burden on the agency to demonstrate that its position was substantially justified. *See Sierra Club v. Marita,* 46 F.3d 606, 619 (7th Cir.1995) (stating that the party challenging agency action under the APA bears the burden of proof); *see also Lively v. Bowen,* 858 F.2d 177, 180 (4th Cir.1988) (stating that under the EAJA the government has the burden of proving that its position was substantially justified). Since the present action is brought under the EAJA, the burden of proof is on Defendants. Therefore, to avoid an award of fees and expenses, Defendants must show that they were substantially justified in preparing and approving the FEIS. "[W]hen determining whether the government's position in a case is substantially justified," the court must "determine, from the totality of the circumstances, whether the government acted reasonably in causing the litigation or in taking a stance during the litigation." *Roanoke River Basin Ass'n v. Hudson,* 991 F.2d 132, 139 (4th Cir.1993). In the present case, that determination requires an examination of the FEIS in light of NEPA's requirements.

Plaintiffs allege that the FEIS failed to comply with NEPA for several reasons, including: (1) the FEIS was too narrow in scope; (2) the FEIS's analysis of need and purpose for the project prevented a fair comparison of alternatives to the proposed beltway; (3) the FEIS inadequately analyzed reasonable alternatives; (4) the FEIS contained an erroneous cost-benefit analysis; (5) the FEIS did not consider adequately the beltway's effect on air quality; (6) the FEIS did not examine sufficiently the project's effect on development in the area and the effect of that development on the environment; (7) the FEIS failed to analyze the cumulative impacts of the project; and (8) Defendants failed to supplement the FEIS based on new information. Each of these alleged shortcomings is examined below.

### 1. *Scope of the FEIS*

 Although the North Carolina Highway Trust Fund describes the Winston–Salem Northern Beltway as a single,

continuous loop facility stretching from I–40 west of Winston–Salem northerly to I–40 in eastern Forsyth County, Defendants elected to divide the Beltway into Western and Eastern Sections and to prepare a separate environmental impact statement for each section. *See* N.C. Gen.Stat. § 136–180 (describing the proposed Northern Beltway). Plaintiffs contend that this partitioning of the Northern Beltway violates NEPA. Plaintiffs argue that the FEIS should have analyzed both sections of the Northern Beltway in the same document because, "[a]s a general rule under NEPA, segmentation of highway projects is improper for purposes of preparing environmental impact statements." *Piedmont Heights Civic Club, Inc. v. Moreland,* 637 F.2d 430, 439 (5th Cir.1981). This rule against segmentation was developed to prevent the piecemeal environmental analysis of interrelated projects, which could give an inaccurate impression of overall environmental effects. *See Taxpayers Watchdog, Inc. v. Stanley,* 819 F.2d 294, 298 (D.C.Cir.1987).

Plaintiffs base their argument that segmentation of the Northern Beltway was improper under FHWA regulations and Fourth Circuit case law. An additional set of federal regulations, known as CEQ regulations, also addresses the proper scope of an environmental impact statement.

### a. *FHWA regulations*

Segmentation may be proper in some instances and the FHWA has developed a regulation for determining when segmentation may be allowed. According to this FHWA regulation, segmentation may be permitted when the resulting segments:

(1) Connect logical termini and [are] of sufficient length to address environmental matters on a broad scope;

(2) Have independent utility or independent significance, i.e., [are] usable and

[are] a reasonable expenditure even if no additional transportation improvements in the area are made; and

(3) [Do] not restrict consideration of alternatives for other reasonably foreseeable transportation improvements.

23 C.F.R. § 771.111(f).

Each of the factors set forth in the FHWA regulation bears on whether segmentation is proper. In the context of a highway within a single metropolitan area, as opposed to a highway connecting different cities, courts have focused primarily on whether the segment has "independent utility" and placed less emphasis on the other two factors. *See, e.g., Coalition on Sensible Transp., Inc. v. Dole,* 826 F.2d 60, 69 (D.C.Cir.1987); *Piedmont Heights,* 637 F.2d at 440.

### i. *logical termini and sufficient length*

Plaintiffs argue that selection of *any* termini for the Western Section was improper because, "the Western and Eastern Sections are one project, they are one road intended to create a single loop around the city of Winston–Salem. A loop, by definition, can have no logical termini and thus both sections should have been evaluated in a single, comprehensive environmental impact statement." (Pls.' Mem. in Opp'n to Fed. Defs.' Mem. Regarding Substantial Justification [Doc. # 63] at 15). Plaintiffs cite a comment by the EPA to support their position that the Beltway project should not have been segmented. After reviewing the FEIS, the EPA stated in a letter to State Defendants that, "[p]lanning and evaluations of urban beltway projects should be done comprehensively. Otherwise, setting end termini for a middle segment biases the planning of the adjoining segments. This is the case with this beltway project." (ROD,

Appendix B, Letter from Mueller to Vick of 4/23/96, at 2).[17]

Plaintiffs' argument fails to consider the definition of "logical termini." An FHWA policy and procedure memorandum has defined "logical termini" to include major crossroads, population centers, major traffic generators, or similar highway control elements. 37 Fed.Reg. 21,810 (1972). The proposed Western Section was planned to extend from U.S. 158 southwest of Winston–Salem to U.S. 52 in the north. These major crossroads satisfy the definition of "logical termini," and therefore the Western Section complies with 23 C.F.R. § 771.111(f) by connecting logical termini.

The Western Section was also of sufficient length to address environmental concerns on a broad scope. Alternatives for the Western Section ranged in length from 16.3 to 17.6 miles, and the preferred alternative measured 17.3 miles in length. Other courts that have addressed this issue have held that even shorter highway sections satisfy the "sufficient length" requirement. For example, in *Association Concerned About Tomorrow, Inc. v. Dole*, 610 F.Supp. 1101 (N.D.Tex.1985), the court found that two segments of proposed highway construction, one segment 22.9 miles long and the other only 3.4 miles long, were both of sufficient length to address environmental matters on a broad scope. *See id.* at 1108–09 (stating "[t]he lengths of highway covered in each EIS are theoretically sufficient for [consideration of environmental matters on a broad scope]"); *Save Barton Creek Ass'n v. Federal Highway Admin.*, 950 F.2d 1129, 1140–42 (5th Cir.1992) (finding that if NEPA requirements had applied, a 5.5 mile long stretch of highway was sufficiently lengthy). In contrast, the court in *Thompson v. Fugate*, 347 F.Supp. 120 (E.D.Va.1972), found that partitioning an 8.3 mile section of a 75–mile circumferential beltway around Richmond violated NEPA. In *Fugate*, however, the court's decision turned on the fact that the defendants segmented out the 8.3 mile portion of highway in an attempt to avoid the application of NEPA to an area with significant historical importance. The defendants in *Fugate* planned to fund the partitioned section of highway exclusively with state monies and thereby avoid NEPA requirements for that section. In clear distinction from *Fugate*, Defendants in the instant case did not try to dodge NEPA requirements with respect to the Western Section. Although Defendants partitioned the Northern Beltway, they attempted to comply with NEPA by preparing environmental impact statements for both resulting sections of the Beltway. Considering the precedent case law on this issue, the proposed Western Section was of sufficient length to address environmental matters on a broad scope.

17. Plaintiffs claim that Defendants inadequately responded to this comment by the EPA and to another comment by the North Carolina Division of Environmental Management ("NCDEM"). According to Plaintiffs, Defendants' inadequate responses constitute violations of NEPA.

　　As stated by the Ninth Circuit, "[a]gency 'concerns' and criticism alone do not undermine the validity of an Environmental Impact Statement." *Carmel*, 123 F.3d at 1151. In addition, NCDEM's comment was made upon review of the draft environmental impact statement.

Although comments to a Draft EIS may direct an agency to consider an alternative, NEPA does not require an agency to consider every alternative suggested by comment. Comments by a reviewing agency of the state or federal government directing consideration of certain factors are considered by a reviewing court, but such comments are not determinative of whether the factors indeed should have been discussed.
*Piedmont Heights*, 637 F.2d at 436 n. 9.

### ii. *independent utility*

In determining the issue of independent utility for the Western Section, the court must examine whether the segment is "usable and [is] a reasonable expenditure even if no additional transportation improvements in the area are made." 23 C.F.R. § 771.111(f)(2). Plaintiffs argue that the primary purpose of the Western Section is to connect with the subsequently constructed Eastern Section to provide a single continuous loop around Winston–Salem. According to Plaintiffs, the relation between these two segments indicates that the Western Section has no independent utility.

Plaintiffs further contend that the similarity between the stated purposes for the Western and Eastern Sections demonstrates each section's lack of independent utility. The FEIS states that the Western Section will "correct circumferential deficiencies in the current radial dominated road network in Western Forsyth County" as well as relieve congestion on the principal arterials and serve the future travel needs of a rapidly growing area. (FEIS at S–2). Meanwhile, the proposed Eastern Section will provide orderly and planned relief to traffic congestion in the northeast Winston–Salem area and will connect U.S. 52 with U.S. 421/I40–Business. (*See* Fed. Defs.' Mem. Regarding Substantial Justification [Doc. # 57] at 3). Plaintiffs argue that these purposes amount to a distinction without a difference. According to Plaintiffs, both Sections serve the same purpose: to provide a route around the city. The only difference is that one Section is on the west side of the city, the other on the east. Plaintiffs argue that this similarity in purpose undercuts Defendants' position that each Section has independent utility.

Defendants do not dispute that the proposed construction of the Western Section represents the first step in a larger project, the development of the Northern Beltway, which has been contemplated by policy-makers for decades and scheduled for funding since passage of the North Carolina Highway Trust Fund in 1989. Defendants admit the relationship between the Western and Eastern Sections in the draft environmental impact statement for the Eastern Section, which states:

> Completion of the Northern Beltway will provide a loop facility encircling the northern section of Winston Salem .... A feasibility study of the Northern Beltway (Eastern Section) Extension from U.S. 421/I–40 Business to U.S. 311 Freeway is currently under study by NCDOT. *A missing link or gap in this loop would occur if the Northern Beltway projects were not completed.* As a result, the Winston–Salem area would not receive the maximum economic and road-user benefits associated with a complete circumferential transportation system.

(Pls.' Mem. in Opp'n to Federal Defs.' Mem. Regarding Substantial Justification [Doc. # 63], Ex. 2 at I–5) (emphasis added). Nevertheless, the plan eventually to connect the Western and Eastern Sections of the Northern Beltway does not render each section without independent utility. The Western Section could fulfill its stated purpose-to improve north-south travel in the radial-dominated suburbs of western Forsyth County, relieve congestion on principal arterial roads, improve safety by reducing traffic in residential areas, and serve the travel needs of a rapidly growing area-regardless of whether the Eastern Section were ever constructed.

In addition, even though the Western and Eastern Sections might serve similar purposes, relieving congestion on their respective sides of the city, this does not prevent each from having independent util-

ity. As defined in FHWA regulations, independent utility does not mean *unique* utility. Instead, it means that the segmented portion "[is] usable and [is] a reasonable expenditure even if no additional transportation improvements in the area are made." 23 C.F.R. § 771.111(f)(2); *see also Coalition on Sensible Transp.*, 826 F.2d at 69 ("The proper question is whether one project will serve a significant purpose even if a second related project is not built."). The fact that the Western and Eastern Sections might serve the same functions in different locations has no bearing on whether each has independent utility. Moreover, even though the Western Section might not achieve its *maximum* utility without construction of the Eastern Section, that does not necessarily lead to the conclusion that the Western Section does not have substantial independent utility. The plain language of 23 C.F.R. § 771.111(f)(2) requires only that the Western Section have independent utility, not that it attain its maximum potential utility. The court finds the Western Section to have independent utility as defined in 23 C.F.R. § 771.111(f)(2).

### iii. *restrict consideration of alternatives*

Plaintiffs also argue that analyzing the environmental impact of the Western Section separately from the Eastern Section restricts the consideration of alternatives for other "reasonably foreseeable transportation improvements." 23 C.F.R. § 771.111(f)(3). The location of the Western Section inevitably anchors any future connection point between the Western and Eastern Sections. To this extent, alternatives for the Eastern Section are restricted. This alone, however, does not suffice to show that Defendants acted arbitrarily or capriciously by segmenting the Northern Beltway. *Every* segmentation, even those undertaken in compliance with FHWA regulations restricts the location of

future connecting transportation improvements. *See Save Barton Creek*, 950 F.2d at 1142 (finding that the siting of one portion of a loop roadway did not dictate the construction of any other segment, the size of any other segment, or the alignment of the rest of the loop); *Clairton Sportsmen's Club v. Pennsylvania Turnpike Comm'n*, 882 F.Supp. 455, 473 (W.D.Pa.1995) (finding that some restriction on the siting of subsequent roadway segments due to the placement of a previously constructed roadway segment is permissible under NEPA). Once the location for one segment is determined, a subsequently constructed connecting segment *must* meet the first segment at a fixed point of intersection. As a result, all projects with connecting segments, even those partitioned in compliance with FHWA regulations, minimally restrict the consideration of alternatives for future transportation improvements. The proper question, then, is not whether segmentation restricts the location of the endpoints to reasonably foreseeable transportation improvements, but whether segmentation restricts the location of an appreciable length of future alternatives.

In this case, setting the location of the Western Section did not extensively restrict alternative locations for the Eastern Section. The FEIS indicates that Defendants performed environmental analyses far enough beyond the northern terminus at U.S. 52 to ensure that alternatives for the Eastern Section were not restricted and that the Eastern Section would not have significant environmental impacts as a result of the location of the Western Section. (*See* FEIS at 2–9) (stating that five northern endpoints for the Western Section as well as direct and staggered connections between the sections were considered). Furthermore, the FEIS states that the selected location of the northern terminus is the best alternative

based on the function of the transportation network, disruption to business and residential areas, impacts to historic sites, and costs. (FEIS at 7–21). Such a determination is a matter of agency expertise beyond the court's scope of review. By ensuring that the location of the Western Section would still permit a significant number of potential locations for the Eastern Section, the Defendants avoided restricting the consideration of alternatives for other reasonably foreseeable transportation improvements. Consequently, the court finds that Defendants did not violate FHWA regulations in segmenting the Northern Beltway.

### b. *CEQ regulations and case law*

FHWA regulations allow for segmentation of proposed actions if certain criteria are met. In contrast, regulations issued by the Council on Environmental Quality ("CEQ") direct agencies as to when segmentation should not occur.[18] CEQ regulations are binding on all federal agencies and are entitled to substantial deference. *See Andrus v. Sierra Club*, 442 U.S. 347, 358, 99 S.Ct. 2335, 60 L.Ed.2d 943 (1979); *Sugarloaf Citizens Ass'n v. Fed. Energy Regulatory Comm'n*, 959 F.2d 508, 512 n. 3 (4th Cir.1992). In pertinent part, CEQ regulations prescribe the scope of the environmental impact statement as follows:

> *Scope* consists of the range of actions, alternatives, and impacts to be considered in an environmental impact statement.... To determine the scope of en-

vironmental impact statements, agencies shall consider 3 types of actions, 3 types of alternatives, and 3 types of impacts. They include:

> (a) Actions (other than unconnected single actions) which may be:
>
> . . . .
>
> (2) Cumulative actions, which when viewed with other proposed actions have cumulatively significant impacts and should therefore be discussed in the same impact statement.

40 C.F.R. § 1508.25 (emphasis in original). Although federal agencies are given "the primary task of defining the scope of NEPA review and their determination is given considerable discretion, ... cumulative actions must be considered together to prevent an agency from dividing a project into multiple actions, each of which individually has an insignificant environmental impact, but which collectively has a substantial impact." *Wetlands Action Network v. United States Army Corps of Eng'rs*, 222 F.3d 1105, 1118 (9th Cir.2000) (internal quotations omitted). The Western and Eastern Sections constitute cumulative actions, and therefore should have been considered in the same environmental impact statement.[19]

In *Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208 (9th Cir.1998), the Ninth Circuit held that a single environmental impact statement should have been prepared for five related timber sales. The court found the sales were cumulative actions because they were part of a single project, were announced simul-

---

**18.** The National Environmental Policy Act's implementing regulations were formulated by the Council on Environmental Quality and appear at 40 C.F.R. §§ 1500–1508.

**19.** The Western and Eastern Sections may also constitute "similar actions" as defined in 40 C.F.R. § 1508.25(a)(3). Whether to examine similar actions in a single environmental

impact statement is largely left to agency discretion. The regulation states that an agency "may wish" to analyze the similar actions in the same environmental impact statement. See 40 C.F.R. § 1508.25(a)(3). Therefore, even if the Western and Eastern Sections are similar actions, this provides no basis for finding a violation of NEPA.

taneously, and were reasonably foreseeable. *Id.* at 1214–15. Similarly, in the present case, the Western and Eastern Sections constitute portions of a single project, the Northern Beltway; funding for the Western and Eastern Sections was announced simultaneously in the North Carolina Trust Fund; and construction of the Western and Eastern Sections was reasonably foreseeable. In addition, the Western and Eastern Sections together would have destroyed over 900 acres of woodland, 15 acres of wetland, and nearly 1000 acres of prime and important farmland. The proposed Northern Beltway would have impacted over 85 acres of flood plains, required the relocation of 2500 feet of stream channels, and forced the relocation of over 500 residences. When viewed in combination, the Western and Eastern Sections have cumulatively significant environmental impacts. Therefore, under CEQ regulations the sections should have been considered in the same impact statement. *See Swain v. Brinegar*, 542 F.2d 364, 368 (7th Cir.1976) (en banc) ("[A]lthough the individual environmental impact [of a segmented project] might be slight, the cumulative consequences could be devastating."); *Resources Ltd., Inc. v. Robertson*, 35 F.3d 1300, 1306 (9th Cir. 1993) ("[W]here several foreseeable similar projects in a geographic region have a cumulative impact, they should be evaluated in a single EIS.") (internal quotations and citation omitted). The decision not to examine the environmental effects of the Western and Eastern Sections in the same document disregarded the CEQ regulation regarding scope of an environmental impact statement.[20]

In addition to the federal regulations already discussed, the Fourth Circuit has affirmed consideration of "the manner in which the roads were planned [and] their geographic locations" as factors that should be considered in determining the proper scope of an environmental impact statement. *James River & Kanawha Canal Parks, Inc. v. Richmond Metro. Auth.*, 359 F.Supp. 611, 635 (E.D.Va.1973), *aff'd*, 481 F.2d 1280 (4th Cir.1973).[21] As described in statutory language and in planning documents, the Northern Beltway,

---

**20.** In distinction from *Kleppe v. Sierra Club*, 427 U.S. 390, 96 S.Ct. 2718, 49 L.Ed.2d 576 (1976) and *Save Barton Creek v. FHWA*, 950 F.2d 1129 (5th Cir.1992), the Eastern Section had moved beyond the mere "contemplation" stage and could be characterized as a proposed action as defined in 40 C.F.R. § 1508.23. The DEIS for the Eastern Section was published in 1995, a year before the publication of the FEIS for the Western Section. Therefore, the Eastern Section constituted as a reasonably foreseeable federal action.

**21.** Defendants argue that the factors approved by the Fourth Circuit in *James River* should not be considered. *James River* was decided in 1973. Defendants claim that since CEQ regulations were signed into law in 1978, and the FHWA NEPA regulations were approved in 1986, the holding of *James River* was superseded by the three-prong test established in 23 C.F.R. § 771.111(f). Other courts, however, have held that factors in addition to the three listed in 23 C.F.R. § 771.111(f) are still properly considered in analyzing whether segmentation violates NEPA. *See, e.g., Save Barton Creek*, 950 F.2d at 1140 and n. 15 (stating that "[s]egmentation becomes suspect ... only after an evaluation of *such factors as*" those "embodied" in FHWA's regulations) (emphasis added); *Coalition on Sensible Transp.*, 826 F.2d at 68 (a "number of courts have relied on *the same or closely similar factors* in their segmentation determinations") (emphasis added); *Taxpayers Watchdog*, 819 F.2d at 298–99 (stating that courts may examine whether federal funds for closely related projects have been irretrievably committed as an additional factor in segmentation analysis); *Clairton Sportsmen's Club*, 882 F.Supp. at 471 n. 16 (stating that "[c]ourts routinely cite and follow these FHWA regulations in segmentation cases, but they have not been described as mandatory").

consisting of the Western and Eastern Sections, is located entirely within Forsyth County. The two Sections of the Beltway were planned to intersect north of the city. This intersection would have given the Sections geographic proximity. In addition, the Beltway has always been considered and treated as a single project by legislators and planners. As stated in the FEIS, "[a] loop facility, identified as the Northern Beltway, has been a part of local and state transportation planning since the 1960's." (FEIS at 1–2). Moreover, the North Carolina Highway Trust Fund Law, which grants funding for the loop, treats the Beltway as a single project. *See* N.C. Gen Stat. § 136–180 (1999). Finally, the region's major planning documents, *Winston–Salem/Forsyth County Thoroughfare Plan* (1989) and *Vision 2005*, also contemplate the Northern Beltway as a single project. Because of the geographic proximity and common planning of the Western and Eastern Sections, they should have been considered in the same environmental impact statement. Failure to do so disregarded the factors approved by the Fourth Circuit in *James River* and failed to consider an important aspect in analyzing the environmental consequences of the proposed Beltway project. Consequently, Defendants' decision to analyze the Western and Eastern Sections of the Northern Beltway in separate documents violated NEPA as interpreted in CEQ regulation and Fourth Circuit case law.

### 2. *Purpose and need*

■ The environmental impact statement shall "briefly specify the underlying purpose and need to which the agency is responding in proposing the alternatives including the proposed action." 40 C.F.R. § 1502.13. Plaintiffs allege that Defendants defined the purpose of the Western Section project too narrowly, thereby preventing a fair consideration of alternatives to the proposed Beltway. Defendants respond that the purpose of the project was properly defined in that it permitted consideration of non-Beltway alternatives. Plaintiffs further allege that the need for the project was never definitively established in the FEIS. Defendants also refute this allegation.

### a. *Purpose*

■ The defined purpose of a proposed action may greatly affect the feasibility of alternatives. "The stated goal of a project necessarily dictates the range of 'reasonable' alternatives and an agency cannot define its objectives in unreasonably narrow terms." *Carmel–by–the–Sea,* 123 F.3d at 1155. If the purpose is defined too narrowly, "only one alternative from among the environmentally benign ones in the agency's power would accomplish the goals of the agency's action, and the EIS would become a foreordained formality." *Citizens Against Burlington, Inc. v. Busey,* 938 F.2d 190, 196 (D.C.Cir.1991).

Plaintiffs argue that Defendants defined the purpose of the Western Section project in such a way that only a circumferential road would suffice. As evidence of this, Plaintiffs point to statements in the FEIS explaining the dismissal of various proposed alternatives. For example, in summarizing the decision to dismiss certain alternatives to the construction of the Western Beltway Section, Defendants stated that "alternatives have been evaluated and were found to be incapable of providing effective solutions *to the need for circumferential roadway improvements.*" (FEIS at 2–50) (emphasis added). Plaintiffs contend that this purpose, to improve circumferential mobility, effectively eliminated all non-beltway alternatives from consideration. As a result, Plaintiffs argue that the purpose of the project was too narrow in scope.

Plaintiffs are correct that circumferential connection of existing roads was one of the major goals for construction of the Western Section, but this does not mean that Defendants defined the purpose for the project too narrowly. In *Sierra Club v. United States Dep't of Transp.*, 962 F.Supp. 1037 (N.D.Ill.1997), the court found that a FEIS proposing construction of a tollroad did not define the purpose of the project too narrowly even though providing a north-south corridor constituted one of the project's major objectives. *Id.* at 1042–43. In addition to this relatively narrow goal, several more general objectives factored into the analysis and ultimate dismissal of alternatives to the tollroad. The court stated that because these broader objectives played a significant part in defining the purpose for the project, the purpose was not defined too narrowly.

Western Forsyth County's current transportation system was built for the purpose of bringing agricultural goods and supplies from outlying rural areas into Winston–Salem. As a result, most of the roads are radial in nature, running from former farming regions to the center of the city like spokes to a hub. These radial roadways lack a continuous connecting road. To move north or south between radial roadways, residents of western Forsyth County must take circuitous routes through residential areas. As western Forsyth County has become more suburban in character, the need to move north and south to reach employment, shopping, and recreation destinations has become more acute.[22] In proposing the Western Section, planners sought to provide a continuous north-south connecting road that would link the existing radial roadways. The intention of connecting roadways was entirely reasonable, and constituted only one of several more general goals for the Western Section.

In addition to linking radial roads, the FEIS discusses other transportation problems in western Forsyth County that the proposed project sought to correct. For example, planners hoped to (1) improve local travel; (2) improve safety; (3) alleviate overflow traffic on currently existing roads; (4) accommodate shifting locations of employment; and (5) ameliorate pollution problems by reducing congestion. These goals all constitute legitimate objectives. Linking radial roadways with a north-south connector is also a reasonable objective. While these objectives limited the range of alternatives that would satisfy the purpose of the project, some limit on alternatives is necessary. *See Citizens Against Burlington*, 938 F.2d at 196 ("[A]n agency [may not] frame its goals in terms so unreasonably broad that an infinite number of alternatives would accomplish those goals and the project would collapse under the weight of the possibilities."). In light of these legitimate objectives, and after consideration of various alternatives, the FEIS concluded that a circumferential roadway would best serve the overall purpose of the project. This conclusion does not indicate that the purpose was defined too narrowly.

### b. *Need*

 Plaintiffs also claim that Defendants failed to show a need for the project in the first place. Plaintiffs argue that, although the FEIS states that the Beltway project "has been a part of local and state

---

**22.** Transportation projections indicate that only 10% of the daily traffic on the Western Section approaching from the north on U.S. 52 would be through-traffic. The vast majority of travelers will be moving from one place to another within Forsyth County. (*See* FEIS at 1–11).

transportation planning since the 1960s," Defendants never set forth reliable empirical data demonstrating the need for the project. (FEIS at 1–2). In the FEIS, Defendants stated that the "[a]verage daily traffic volumes for a new freeway facility located in the preferred corridor range from a low of 30,300 vehicles per day (vpd) ... to a high of 48,800 vpd." (FEIS at 1–34). A year prior to publication of the FEIS, however, Defendants acknowledged that these estimates were overstated, and reduced the traffic volume projections to between 12,000 and 32,000 vehicles per day. (Pls.' Mem. in Supp. of Their Mot. for a T.R.O. and Prelim. Inj. Relief [Doc. # 3], Ex. 14 at 2). When Plaintiffs questioned the use of inflated traffic figures in the FEIS, Defendants responded that the decision to use the higher estimates was made "because these projections would present a worst case scenario for the impacts to the human and natural environment and would also show the worst case for noise and air quality impacts." (Pls.' Mem. in Supp. of Their Mot. for a T.R.O. and Prelim. Inj. Relief [Doc. # 3], Ex. 8 at 11). Defendants also stated in the record of decision that even with the reduced traffic estimates, a need for the proposed facility existed. *Id.*

■ The court defers to Defendants' conclusion that a need for the project existed even with the reduced traffic projections. The purposeful inclusion of inaccurate data in the FEIS, however, is a different matter. "If the district judge finds that the agency did not make a reasonably adequate compilation of relevant information and that the EIS sets forth statements that are materially false or inaccurate, he may properly find that the EIS does not satisfy the requirements of NEPA, in that it cannot provide the basis for an informed evaluation or a reasoned decision." *Sierra Club v. United States Army Corps of Eng'rs,* 701 F.2d 1011, 1030 (2d Cir.1983); *see also Concerned Citizens on I–190 v. Sec'y of Transp.,* 641 F.2d 1, 5 (1st Cir.1981) (stating that the issue is whether the "EIS can be said to constitute a statement which enable[s] those who did not have a part in its compilation to understand and consider meaningfully the factors involved") (internal quotation omitted). Including inaccurate data in the FEIS hinders one of the primary reasons for producing the document: to provide the public with information about federal projects that will impact the environment. Interested members of the public, seeking to understand why a particular project is needed, depend on the accuracy of the information in an environmental impact statement. Inaccurate data might sway members of the public to support a project they would otherwise oppose if they were given accurate information.

In this case, the traffic projections used in the FEIS were not only overstated, they were considerably higher than the updated figures that Defendants decided to omit. While a need for the proposed project might have existed even under the lower traffic projections, the decision to purposefully include the higher, significantly overstated estimates of traffic projections in the FEIS conflicts with one of the major policy goals of NEPA and fails to accurately examine an important aspect of the project. Defendants violated NEPA by purposefully including the inaccurate data in the FEIS. *See* 40 C.F.R. § 1500.1(b) ("Accurate scientific analysis, expert agency comments, and public scrutiny are essential to implementing NEPA.").

3. *Analysis of reasonable alternatives*

■ An environmental impact statement must discuss reasonable "alternatives

to the proposed action." 42 U.S.C. § 4332(2)(C)(iii). Federal regulations require that the FEIS "[d]evote substantial treatment to each alternative considered in detail including the proposed action so that reviewers may evaluate their comparative merits." 40 C.F.R. § 1502.14(b). The consideration of alternatives "is the heart of the environmental impact statement." 40 C.F.R. § 1502.14.

Plaintiffs claim that the FEIS did not adequately analyze alternatives to the proposed Western Section. Specifically, Plaintiffs claim that the FEIS did not provide a detailed analysis of the "No–Build" alternative. The FEIS spent only three pages on the No–Build alternative and Plaintiffs argue that not enough consideration was given to whether techniques such as widening shoulders, adding passing lanes on grades, adding turning lanes at intersections, restricting parking, and providing high occupancy vehicle lanes would successfully achieve the objectives of the proposed project.

Plaintiffs also allege that Defendants made the No–Build alternatives less attractive than the "Build" alternatives in four ways: (1) the same population and employment forecasts were used in analyzing both the Build and No–Build alternatives; (2) the effects of induced traffic from construction of the Western Section were not considered; (3) the FEIS indicated that some existing roadways would have reduced travel capacity in 2015 but did not explain why these roads were expected to have reduced capacity; and (4) the FEIS did not fully address safety concerns associated with the construction of the Western Section.

Although the discussion of No–Build alternatives in the FEIS was brief, such brevity does not necessarily mean that the analysis fails under NEPA. *See Coalition on Sensible Transp., Inc.*, 826 F.2d at 66

("The NEPA process involves an almost endless series of judgment calls .... It is of course always possible to explore a subject more deeply and to discuss it more thoroughly. The line-drawing decisions necessitated by this fact of life are vested in the agencies, not the courts."). The FEIS addressed two potential No–Build alternatives and analyzed them to a reasonable degree. Thus, the extent of the No–Build analysis does not violate NEPA. Some of the assumptions incorporated in the analysis, however, are more problematic.

■■■ Defendants used identical population and employment forecasts when examining both the Build and No–Build alternatives. Courts have addressed the issue of whether using the same socioeconomic data to analyze the Build and No–Build alternatives violates NEPA and have reached different conclusions. In *Sierra Club v. United States Dep't of Transp.*, 962 F.Supp. 1037 (N.D.Ill.), the court stated that:

[T]he final impact statement in this case relies on the implausible assumption that the same level of transportation needs will exist whether or not the tollroad is constructed. In particular, the final impact statement contains a socioeconomic forecast that assumes the construction of a highway such as the tollroad and then applies that forecast to both the build and No–Build alternatives. The result is a forecast of future needs that only the proposed tollroad can satisfy. As a result, the final impact statement creates a self-fulfilling prophecy that makes a reasoned analysis of how different alternatives satisfy future needs impossible.

*Id.* at 1043. In contrast, in *Laguna Greenbelt, Inc. v. United States Dep't of Transp.*, 42 F.3d 517 (9th Cir.1994), the Ninth Circuit found that the defendants

acted reasonably in using the same population data to analyze the feasibility of both the Build and No–Build alternatives. The *Laguna* Court's holding hinged on the fact that 98.5% of the land in the area to be affected by the project was "already accounted for by either existing or committed land uses not contingent on construction of the corridor." *Id.* at 525. In other words, the court in *Laguna* found that development would occur regardless of whether the tollroad was ever built, and therefore the use of the same data in analyzing the Build and No–Build alternatives was reasonable.

In the present case, Defendants justify the use of identical data in analyzing the feasibility of the Build and No–Build alternatives by arguing that the proposed construction would not spur new growth, it would simply accommodate already existing growth or growth that was bound to occur whether or not the Western Section was constructed. Thus, Defendants equate the situation in western Forsyth County to the one in *Laguna.* Unlike *Laguna,* however, Defendants have failed to produce evidence to support their claim that the area to be affected by the Western Section is already "accounted for by either existing or committed land uses." *Laguna,* 42 F.3d at 525. The FEIS discusses population trends which indicate that areas in western Forsyth County are growing faster than those closer to central Winston–Salem,[23] but Defendants fail to

produce definitive evidence that construction of the Western Section would not spur or accelerate further development. In fact, the FEIS expressly states that the Western Section will attract residential and business development. (*See* FEIS at 4–22) ("[I]t is possible that generated revenues may decrease in the short term until balanced by longer-term residential and business development *attracted by the project.*") (emphasis added). Therefore, the court finds that the use of the same statistical data to analyze both the Build and No–Build alternatives fails to provide a reasonable basis for comparison of these alternatives.

■ Plaintiffs also claim that the FEIS fails to sufficiently compare alternatives because it does not consider the effects of induced traffic that the Western Section would cause. Induced traffic is the phenomenon by which increasing roadway capacity also increases the number of drivers using that roadway. There are at least two potential reasons for induced travel. First, by increasing roadway capacity, drivers who would normally take other routes switch to the route with increased capacity. Second, travelers who might not have otherwise driven decide to drive because of the greater convenience resulting from the improved roadway. Plaintiffs argue that the failure of the FEIS to consider induced traffic in analyzing the Build alternatives made these alternatives more

**23.** According to the FEIS:
The population trends in Forsyth County for the past 20 years have shown a preference for growth in areas outside [Winston–Salem]. The approved Growth Management Plan, *Vision 2005*, targets the Muddy Creek Basin in western Forsyth County as a short- and long-term growth area. Major utility infrastructures are in place to support this development. Population in Forsyth County is projected to increase to 330,000 by the year 2015. However, this growth will be greater in the study area than in other parts of western Forsyth County. Population increases within the city limits, east of the Muddy Creek growth area are projected to be 19–percent, an addition of 9,414 people. Population increases of 33–percent are projected for the Muddy Creek growth areas, an addition of 8,572 people. In the rural area west of the Muddy Creek growth areas, population is projected to increase 38–percent, an addition of 4,528 people. (FEIS at 1–42).

attractive than they would have been had induced traffic been considered. Plaintiffs support their contention that induced traffic should have been considered by citing several articles, written by experts, declaring the necessity to measure induced travel if one hopes to adequately analyze the prospective benefits and drawbacks of highway construction. Plaintiffs also argued at the hearing that Defendants implicitly admitted the need to analyze induced traffic in that the DEIS for the Eastern Section accounts for induced traffic.

Defendants' brief does not address Plaintiffs' argument that induced travel should have been considered in the FEIS. The court defers to agency expertise in determining the extent of the effects of induced traffic. Thus, the court hesitates to find that induced traffic must always be considered for a FEIS to adequately evaluate and compare alternatives. Under the Equal Access to Justice Act, however, Defendants bear the burden of proving that their position was substantially justified. In neglecting Plaintiffs' argument, Defendants have failed to carry this burden. Defendants offer no response to the expert opinions submitted by Plaintiffs stating that induced travel may cause considerable increases in traffic. As a result, the court finds that Defendants have failed to justify their omission of any consideration of induced traffic and have violated NEPA by failing to examine an important aspect of the project's environmental effects.

In a final attack on the FEIS's comparison of alternatives, Plaintiffs argue that Defendants did not adequately consider safety issues. Specifically, Plaintiffs contend that the FEIS: (1) included outdated 1989 accident data in the safety analysis; (2) included accident data based on statewide averages rather than based on a detailed analysis of accident records at spe-cific locations; (3) did not consider that dense fog is known to occur in the study area and (4) did not consider the safety effects on two schools in the area.

■■■ Defendants respond to the first alleged shortcoming of the safety analysis in the FEIS by stating that the 1989 accident data was included to support the general proposition that when roadway improvements are made, the accident rate is expected to drop. Furthermore, Defendants justify the decision to use statewide accident data, rather than more targeted data, because the Western Section was expected to improve safety on a system-wide basis, not simply on a few roads. The system-wide safety effects of the Western Section were anticipated because drivers presently seeking to move north or south in western Forsyth County must use non-contiguous neighborhood roads to reach their destinations. The Western Section was expected to remove this through-traffic from neighborhood roads, thereby improving safety on these roads. The project was also expected to improve safety on major arterial roads that are currently at or near maximum volume capacity. Because of the system-wide safety effects the Western Section was expected to have and the general nature of the proposition Defendants were attempting to show in using the 1989 data, the court finds Defendants decision to use 1989 statewide accident data was reasonable.

■■■ With respect to the other alleged shortcomings of the safety analysis in the FEIS-that it did not adequately consider the safety effects of dense fog in the area or the effect that construction of the Western Section would have on two area schools-the court echoes its previous statement that limits must exist on the extent that agencies must analyze possible effects of proposed projects. There is no indication from the record that either of these

two potential safety hazards would have had any significant impact on the decision of whether to proceed with the project. A reviewing court must not "flyspeck" an environmental impact statement. *Half Moon Bay Fishermans' Marketing Ass'n v. Carlucci*, 857 F.2d 505, 508 (9th Cir. 1988). Rather, the court must determine whether the impact statement reasonably considers and analyzes major environmental consequences of the proposed project. In this case, Defendants' safety analysis sufficed under NEPA.[24]

#### 4. Cost-benefit analysis

■ NEPA does not mandate the inclusion of cost-benefit analyses in environmental impact statements. *See* 40 C.F.R. § 1502.23 (*"[W]hen* a cost-benefit analysis is prepared, [an agency should] discuss the relationship between that analysis and any analyses of unquantified environmental impacts, values, and amenities.") (emphasis added). Although not required, the FEIS for the Western Section contained a cost-benefit analysis for the project. Plaintiffs allege that several inaccuracies with the values used in the cost-benefit analysis skewed the decision-making process.

As to particular errors in the cost-benefit analysis, Plaintiffs first contend that the analysis included the total value of the right-of-way comprising the Beltway as a future residual benefit but ignored the annual loss in property taxes that would result from government acquisition of the land. Defendants acknowledge the resulting loss in tax revenues in a later section of the FEIS,[25] but did not factor this loss into the cost-benefit analysis. In addition, Plaintiffs assert that a table in the cost-benefit section of the FEIS lists annual costs and benefits together with one-time costs and benefits, without making a distinction between them. Plaintiffs also claim that the cost-benefit analysis fails to consider the costs of added travel time and vehicle operations costs from induced travel. Finally, Plaintiffs challenge the amount used in the FEIS for the total cost of the Western Section.[26] According to Plaintiffs, the amount stated in the FEIS underestimated the total cost and skewed the cost-benefit analysis to make the preferred alternative more attractive than the No–Build alternative.

Defendants do not contend that the alleged inaccuracies in the cost-benefit analysis were in fact correct. Instead, Defendants argue that the purpose of the cost-

---

**24.** The "Public Safety" section of the FEIS does address the safety concern raised by the known occurrence of dense fog in the area. It states:

> If operations on the Northern Beltway are found to be adversely affected by fog, NCDOT can consider the use of an automatic detection and warning system similar to one being installed by Georgia Department of Transportation along I–75 near Adel, Georgia.... Decision on the use of such a system for this project is likely to occur after operations commence on the facility, though it could be addressed during the final design of the roadway.

(FEIS at 4–23).

**25.** The "Economics" section of the FEIS stated that "[b]ecause privately-owned land will

be removed from the tax roll, it is possible that generated revenues may decrease in the short-term until balanced by longer-term residential and business development attracted by the project." (FEIS at 4–22).

**26.** The FEIS states that the DEIS design cost for the preferred alternative was $220.9 million. The FEIS also indicates that the 1995 preliminary design costs for the preferred alternative increased to $275 million. Plaintiffs state that this estimated cost was again subsequently increased, this time to $325 million. (*See* Pls.' Mem. in Supp. of Their Mot. for a T.R.O. and Prelim. Inj. Relief [Doc. # 3], Ex. 15 at 2).

benefit analysis was to compare alternatives, not to justify the project, and therefore the analysis satisfied NEPA requirements. Defendants further argue that the federal regulation dealing with cost-benefit analyses in environmental impact statements grants considerable discretion to the agency,[27] and that the FEIS contained enough information to allow for a meaningful comparison of alternatives.

In *Hughes River Watershed Conservancy v. Glickman*, 81 F.3d 437, 446 (4th Cir.1996), the Fourth Circuit found an environmental impact statement to be in violation of NEPA because its cost-benefit analysis relied on inflated estimates of the proposed project's economic benefits. The *Hughes River* Court stated that "[b]ecause of the potential for misleading economic assumptions to defeat the functions of an EIS,[28] we will engage in a 'narrowly focused' review of the economic assumptions underlying a project to determine whether the economic assumptions 'were so distorted as to impair fair consideration' of the project's adverse environmental effects." *Hughes River*, 81 F.3d at 446 (quoting *South La. Envtl. Council, Inc. v. Sand*, 629 F.2d 1005, 1011 (5th Cir.1980)). Several factors distinguish *Hughes River* from the present case. First, in *Hughes River* the erroneous cost benefit analysis inflated the projected economic benefit from the proposed action by thirty-two (32) percent. The agencies responsible for preparing the FEIS in *Hughes River* mistakenly included gross economic benefit values rather than net values into their cost-benefit analysis, resulting in a much higher projected economic benefit. With respect to the al-

leged deficiencies in the cost-benefit analysis for the Western Section, even if the loss of property tax revenue and cost of induced travel was improperly excluded from the cost-benefit analysis, there is no indication that the resulting miscalculation approaches the magnitude of the error in *Hughes River*. Moreover, in *Hughes River* the agencies expressly stated in the FEIS that the values used to calculate the economic benefit of the proposed project were net values. In contrast, even if the Defendants employed erroneous economic assumptions in the cost-benefit analysis for the Western Section, they did not expressly mislead the document's readers. Finally, the *Hughes River* court stated that the erroneous cost-benefit analysis played a crucial part in the evaluation of whether to undertake the project. In the current case, even under the least favorable discount rate assumptions, the alternatives detailed in the cost-benefit analysis had positive benefit/cost ratios. (*See* FEIS at 2–34). Therefore, it appears that the cost-benefit analysis did not play a decisive role in the decision of whether to undertake the proposed project.

In addition to these distinctions from *Hughes River*, in calculating the cost-benefit analysis Defendants followed guidelines published by the American Association of State Highway and Transportation Officials. These guidelines are "nationally-accepted ... for highway project [cost-effectiveness analyses]." (FEIS at 2–31). Consequently, the court finds that the cost-benefit analysis in the FEIS, although not perfect, complied with NEPA requirements.

27. *See* 40 C.F.R. § 1502.23.

28. The court defined these functions as (1) ensuring that an agency, when deciding whether to approve a project, will carefully consider, or take a "hard look" at, the project's environmental effects and (2) ensuring

that relevant information about a proposed project will be made available to members of the public so that they may play a role in both the decision-making process and the implementation of the decision. *See Hughes River*, 81 F.3d at 443.

5. *Air quality*

■ NEPA requires an analysis of air quality. 40 C.F.R. §§ 1502.16, 1508.8(b). Plaintiffs allege several shortcomings with the air quality analysis in the FEIS for the Western Section. First, Plaintiffs contend that the FEIS inadequately addressed the effect construction of the Western Section would have on ozone levels. The FEIS devoted only two paragraphs of discussion to the expected changes in the ozone level resulting from completion of the Western Section:

> The projected traffic for the project is not expected to create emissions of HC and NO that would exceed the air quality standards. There is the potential of increased emissions of HC and/or NO due to future traffic increases with or without the project.

> Hydrocarbons and nitrogen oxides emitted from cars are carried into the atmosphere where they react with sunlight to form ozone and nitrogen dioxide. It is the ozone and nitrogen dioxide that are of concern, and not the precursor hydrocarbons and nitrogen oxide. Area-wide automotive emissions of HC and NO are expected to decrease in the future due to the continued installation and maintenance of pollution control devices on new cars, and thus help lower ambient ozone and nitrogen dioxide levels.

(FEIS at 4–48). Plaintiffs argue that this brief discussion fails to satisfy Defendants' responsibilities under NEPA.

Defendants cite an FHWA Memorandum "Discussion Paper" to justify their decision not to quantitatively analyze the Western Section's effect on ozone levels.[29] The "Discussion Paper," written in 1986, states that "[o]zone is not a concern at the project level, because it is an areawide pollutant which is analyzed in system-level planning as part of the [State Implementation Plan] development process." (Fed. Defs.' Mem. Regarding Substantial Justification [Doc. # 57], Ex. B at 1). This view contrasts with *Sierra Club v. United States Dep't of Transp.*, 962 F.Supp. 1037 (N.D.Ill.1997), which held that, "an impact statement is incomplete without an analysis of the effect the [project] will have on the production of ozone in the region." *Id.* at 1045. The *Sierra Club* court based this holding on its interpretation of a CEQ regulation, 40 C.F.R. § 1502.16.[30] This regulation mandates a discussion of environmental consequences but does not specify the need for a quantitative analysis of ozone levels.

Given that the primary reasons for the FEIS are to provide accurate information about a proposed project's environmental effects to decision-makers and to the public, it would seem appropriate to include a discussion of the proposal's impact on ozone levels. This court, however, defers to agency expertise and recognizes Defendants' documented position that an ozone analysis on the project level would provide little benefit because of the area-wide nature of the pollutant. Accordingly, Defendants decision not to include a quantitative ozone analysis did not violate NEPA.

---

**29.** The "Discussion Paper," entitled "Appropriate Level of Highway Air Quality Analysis for a CE, EA/FONSI, and EIS" was authored by FHWA's Office of Environmental Policy, Noise and Air Analysis Division.

**30.** 40 C.F.R. § 1502.16, entitled "Environmental Consequences," mandates that the EIS discuss direct and indirect environmental effects of a proposed action. It also states, "discussion will include the environmental impacts of the alternatives including the proposed action [and] any adverse environmental effects which cannot be avoided should the proposal be implemented." 40 C.F.R. § 1502.16.

Plaintiffs also argue that the CO emissions analyses in both the DEIS and the FEIS were inadequate because they used outdated technology. Both analyses used EPA's MOBILE 4 program.[31] MOBILE 4.1 became available while Defendants were conducting the air quality analysis for the Western Section's DEIS. Because Defendants had already started the air quality analysis for the Western Section's DEIS using MOBILE 4, they continued to use this model rather than updating to MOBILE 4.1. The decision not to use MOBILE 4.1 prompted the EPA, after reviewing the DEIS, to comment that "[i]t is important that an analysis, using MOBILE 4.1, pertaining to carbon monoxide and hydrocarbons be completed." (FEIS at B–36). Defendants never performed such an analysis. Even though the FEIS was issued nearly four years after the DEIS and MOBILE 5a, an even more advanced highway vehicle emission factor model, became available in 1993, the FEIS contains an air quality analysis practically identical to the analysis in the DEIS. (*Compare* DEIS at 4–42 to 4–43 *with* FEIS at 4–48 to 4–49).[32]

In *Seattle Audubon Soc. v. Espy*, 998 F.2d 699 (9th Cir.1993), the court found an environmental impact statement inadequate in part because of its reliance on stale scientific evidence. *See id.* at 704–05. Moreover, federal regulations state that an "[a]ccurate scientific analysis ... [is] essential to implementing NEPA." 40 C.F.R. § 1500.1(b). Some courts have found that "NEPA does not require an agency to use the best scientific methodology available,"

but even those courts have recognized that when the most accurate scientific data is not used, the agency must explain why it is lacking. *Sierra Club v. United States Dep't of Transp.*, 962 F.Supp. at 1043 (citing *Sierra Club v. Marita*, 46 F.3d 606, 623 (7th Cir.1995)); *see also* 40 C.F.R. § 1502.22 ("When an agency is evaluating reasonably foreseeable significant adverse effects on the human environment in an environmental impact statement and there is incomplete or unavailable information, the agency shall always make clear that such information is lacking."). Defendants' decision not to update the FEIS with more accurate air quality data prevented decision-makers and the public from more fully understanding the effect on air quality that the Western Section would have. Without an explanation of why the more accurate MOBILE devices were not used, the air quality analysis included in the FEIS fails to meet NEPA requirements.

### 6. *Indirect effects*

A FEIS must address the indirect environmental effects of the proposed action. 40 C.F.R. § 1502.16(b); *see also* N.C. Admin. Code tit. 1, r. 25.0603(6)(b) (May 1993). Plaintiffs contend that the FEIS failed to consider adequately the Western Section's indirect effects. Indirect effects include "growth inducing effects and other effects related to induced changes in the pattern of land use, population density or growth rate, and related effects on air and water and other natural systems, including ecosystems." 40 C.F.R. § 1508.8(b). Defendants must consider

---

**31.** MOBILE is the EPA's highway vehicle emission factor model. Each generation of the MOBILE model has become more sophisticated and more accurate.

**32.** Although EPA responded to the DEIS by calling for an air quality analysis with a later

model MOBILE program and Defendants apparently never undertook such an updated analysis, EPA commented that the air quality analysis in the FEIS was "acceptable." (ROD, Appendix B, Letter from Mueller to Vick of 4/23/96, at 1).

only those indirect effects that are reasonably foreseeable. There is no need to consider potential effects that are highly speculative or indefinite. *See Kleppe*, 427 U.S. at 402, 96 S.Ct. 2718.

▮▮▮ Plaintiffs support their contention that the FEIS inadequately addressed the indirect effects of the Western Section by citing a comment made by the Fish and Wildlife Service after reviewing the draft environmental impact statement. The Fish and Wildlife Service stated that the DEIS failed to address "impacts expected *due to other construction and development* within the project area likely to result from the new highway. [The DEIS] should be revised to fully assess both the direct and indirect effects on resident and migratory wildlife resulting from habitat loss and alteration associated with each alternative." (FEIS at B–40) (emphasis added). Contrary to the Fish and Wildlife Service's suggestion, Defendants did not fully revise the indirect effects analysis included in the FEIS. Plaintiffs also support their contention that the indirect effects analysis in the FEIS was insufficient by pointing out that the Western Section was planned to have at least eight interchanges, including three major interchanges. (FEIS at 2–26). Plaintiffs argue that the FEIS should have more fully analyzed the growth-inducing effects these interchanges would have because "a large interchange on a major interstate highway in an agricultural area where no connecting road currently exists will have a substantial impact on a number of environmental factors." *City of Davis v. Coleman*, 521 F.2d 661, 675 (9th Cir.1975).[33]

Defendants counter that the FEIS adequately addressed the indirect environmental effects that would result from the construction of the Western Section. Defendants argue that indirect impacts associated with other development would be expected to occur even without the project, due to water and wastewater infrastructure improvements in the area and the planned land use decisions of local governments. Defendants also state that rather than inducing growth, the project would have assisted in alleviating traffic caused by development that was inevitably bound to occur. (*See* FEIS at 7–16, Comment 24) (stating that "development ... will occur without this project, due to recent water and wastewater infrastructure improvements, and as guided by land use planning contained in *Vision 2005*. This project will help alleviate the traffic problems that will occur from this development").

As discussed earlier, Defendants fail to present any definitive evidence to support their claim that development would occur to the same extent or at the same rate absent construction of the Western Section. Demographic trends indicate that the area affected by the Western Section is growing faster than other parts of Forsyth County, but this does not necessarily mean that the proposed project would have no effect on the amount or pace of development. *See* 40 C.F.R. 1508.8(b) (Indirect effects include "effects related to ... growth rate."). While this situation is not entirely like that in *City of Davis*, where the proposed project was deemed an "essential catalyst" to development, western Forsyth County still has significant growth potential. *City of Davis*, 521

---

**33.** The FEIS acknowledges the rural character of the area to be effected by the project: "Due to the existing rural nature of the project area, such local changes in runoff are not likely to adversely impact downstream of the crossing." (FEIS at 4–53). The FEIS elsewhere states that "the study area is a fragmented mosaic of forested, agricultural, and man-dominated lands." (FEIS at 4–113).

F.2d at 674. The position that construction of the Western Section would have no effect on future growth in the area contradicts common sense. Defendants themselves acknowledge the growth-inducing potential of the Western Section when discussing the project's economic impact:

> The proposed Northern Beltway will facilitate south/north travel through direct linkage of U.S. 158, I–40, U.S. 421, and U.S. 52, *and would potentially serve as a catalyst for regional economic development.*
>
> Secondary impacts could include an influx of businesses and industry, particularly those with high space and transportation access requirements, to the study area.

(FEIS at 4–22) (emphasis added). This potential growth-inducing effect of the Western Section underscores the necessity of a complete analysis of the projects indirect impacts. However, the FEIS does not discuss any of the potential environmental effects resulting from prospective induced growth. Consequently, the court finds that Defendants failed to address an important aspect of the Western Section's potential environmental impact and have neglected a statutory duty under NEPA.

### 7. *Cumulative environmental impacts*

In addition to addressing the indirect environmental effects of proposed action, a FEIS must also consider the cumulative impacts of that action. 40 C.F.R. § 1508.25(c); *see also* N.C. Admin. Code tit. 1, r. 25.0603(6)(c) (May 1993). Federal regulations define "cumulative impact" as:

> [T]he impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person un-

dertakes such other actions. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time.

40 C.F.R. § 1508.7. If an agency lacks the information to perform a cumulative impact analysis, "the agency shall always make clear that such information is lacking." 40 C.F.R. § 1502.22. Plaintiffs argue that the FEIS fails to adequately discuss the cumulative impacts of the Western Section and fails to make clear that the information to perform a cumulative impact analysis is lacking.

In *Fritiofson v. Alexander*, 772 F.2d 1225 (5th Cir.1985), *abrogated on other grounds, Sabine River Auth. v. United States Dep't of Interior*, 951 F.2d 669 (5th Cir.1992), the Fifth Circuit stated that:

> [A] meaningful cumulative-effects study must identify: (1) the area in which effects of the proposed project will be felt; (2) the impacts that are expected in that area from the proposed project; (3) other actions-past, proposed, and reasonably foreseeable-that have had or are expected to have had or are expected to have impacts in the same area; (4) the impacts or expected impacts from these other actions; and (5) the overall impact that can be expected if the individual impacts are allowed to accumulate.

*Id.* at 1245. The court went on to say that it did not expect a "full blown environmental analysis of the impacts of other actions," but that it did expect "that other actions *and their probable impacts* be identified and considered in determining whether the impacts from the specific proposal before the agency may be significant." *Id.* at 1245 n. 15 (emphasis added). While the FEIS contains a list of reasonably foreseeable "major transportation projects" for Forsyth County, it does not consider the probable impacts of these projects. (FEIS at 1–22). ' In addition,

the list of reasonably foreseeable major transportation projects consists of only those projects that would be undertaken if construction of the Western Section did not occur. The list does not include the Eastern Section and the FEIS does not contain an analysis of the cumulative environmental impact caused by construction of both the Western and Eastern Sections. *See City of Tenakee Springs v. Clough,* 915 F.2d 1308, 1312 (9th Cir.1990) ("NEPA requires that where several actions have a cumulative or synergistic environmental effect, this consequence must be considered in an EIS.").

▆▆▆ In the DEIS for the Eastern Section, Plaintiffs state that "direct cumulative impacts [of the two Sections] have been considered in that the Environmental Impact Statements for the Winston–Salem Northern Beltway, Eastern and Western Sections, have been prepared essentially during the same time period and reviewed by the same agencies." (Pls.' Mem. in Supp. of Their Mot. for a T.R.O. and Prelim. Inj. Relief [Doc. # 3], Ex. 10 at IV–26).[34] This misconstrues NEPA's cumulative impacts requirement. The purpose of the cumulative impact analysis is to provide readers with a complete understanding of the environmental effects a proposed action will cause. Separating the cumulative effects discussion into discrete environmental impact statements eliminates the context necessary for readers to comprehend fully the project's overall environmental effects. *See LaFlamme v. Fed. Energy Regulatory Comm'n,* 852 F.2d 389, 401–02 (9th Cir.1988) (finding

that agency consideration of specific projects in isolation is insufficient to replace analysis of the impact of a program as a whole); *Association Concerned About Tomorrow, Inc. (ACT),* 610 F.Supp. at 1109 ("The EIS *must gather in one place* the discussion of environmental impacts and alternatives so that it serves as a comprehensive document on which responsible agency officials and others might rely.") (emphasis added). Failing to perform a cumulative impact analysis with no explanation for why such an analysis was not performed fails to examine an important aspect of the environmental issues involved with the Western Section. As a result, Defendants violated NEPA by inadequately addressing cumulative impacts in the FEIS.

### 8. *Need to supplement the FEIS*

▆▆▆ An agency must supplement a draft or final environmental impact statements if "[t]here are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts." 40 C.F.R. § 1502.9(c)(1)(ii). "The new circumstance must present a *seriously* different picture of the environmental impact of the proposed project from what was previously envisioned." *Hughes River,* 81 F.3d at 443 (emphasis in original, internal quotations omitted). The Fourth Circuit has developed a two-part test for determining whether an agency must prepare a supplemental EIS: "First, the court must determine whether the agency took a hard look

---

34. Defendants also state that an analysis of the cumulative effects of the Western and Eastern Sections in the same document "would not yield any information of discernible merit to a decision-maker since each is a separate proposal with independent utility and independent use." (Fed. Defs.' Mem. Regarding Substantial Justification [Doc. # 57] at 15 n. 3). This position confuses the issues

of the scope of cumulative impact analysis and the scope of the environmental impact statement as a whole. Multiple actions with independent utility and independent use may affect the cumulative environmental impact to an area and may need to be considered in each action's cumulative impact analysis even if the actions are analyzed in separate environmental impact statements.

at the proffered new information. Second, if the agency did take a hard look, the court must determine whether the agency's decision not to prepare a supplemental EIS was arbitrary or capricious." *Id.*

[46] Plaintiffs contend that Defendants violated NEPA regulations by failing to supplement the FEIS after the May 8, 1996, announcement that Forsyth County's Transportation Improvement Program had fallen out of conformity with the Clean Air Act. Plaintiffs state that this announcement should have prompted Plaintiffs to undertake a more detailed analysis of the area's air quality and the effect the Western Section would have on air quality.

While courts generally defer to the "informed discretion of the responsible federal agencies," Defendants have offered no explanation for the failure to supplement the FEIS after the announcement of non-conformity in May 1996. *See Kleppe*, 427 U.S. at 412, 96 S.Ct. 2718. There is no evidence that Defendants performed the first step of the *Hughes River* test; nothing in the record indicates that Defendants took a hard look at how the new information that the area's TIP had fallen out of conformity with the Clean Air Act might affect the air quality analysis for the Western Section. In addition, in light of the outdated technology used to undertake the air quality analysis, the need for a supplemental CO analysis should have been readily apparent following the non-conformity announcement. As discussed in the "Air Quality" section above, the CO analysis included in the FEIS was criticized by EPA for using outdated computer modeling techniques. Notification of an air quality problem should have spurred Defendants into performing a supplemental CO analysis with more accurate modeling tools. The decision not to perform such an analysis, without any explanation for this decision, was in violation of NEPA.

**B. *Special circumstances***

Both the Equal Access to Justice Act and Section 6–19.1 of the North Carolina General Statutes preclude an award of fees if special circumstances would make such an award unjust. *See* 28 U.S.C. § 2412(d)(1)(A); N.C. Gen.Stat. § 6–19.1. The burden of proving special circumstances is on Defendants. *See Brinker v. Guiffrida*, 798 F.2d 661, 663 (3d Cir.1986); *Walker v. North Carolina Coastal Resources Comm'n*, 124 N.C.App. 1, 5, 476 S.E.2d 138, 141 (1996). Federal Defendants do not argue that any special circumstances prevent an award of fees and expenses against them.

State Defendants argue that special circumstances exist because they reasonably relied on the decisions and expertise of the Federal Defendants in proceeding with development of the Western Section. This argument totally abdicates State Defendants' responsibilities and places those responsibilities on Federal Defendants. The argument also ignores the State Defendants' responsibility to prepare an adequate environmental impact statement under NCEPA. In *Walker v. North Carolina Coastal Resources Comm'n,*, the North Carolina Court of Appeals found that misplaced reliance on another agency does not satisfy the special circumstances provision of N.C.G.S. § 6–19.1. *See Walker*, 124 N.C.App. at 9–10, 476 S.E.2d at 143–44. "Courts which have found special circumstances have done so on the basis of novel legal issues or on the equitable basis of a prevailing party's unclean hands." *Brinker*, 798 F.2d at 667 (citations omitted). Neither of these circumstances apply in the present case. The court finds that no special circumstances exist which would prevent Plaintiffs from

recovering attorney's fees from State Defendants.

## CONCLUSION

For the foregoing reasons, Plaintiffs are entitled to recover attorney's fees and expenses from Federal Defendants pursuant to 28 U.S.C. § 2412(b). In addition, the court finds that, based on the totality of the circumstances and the significant shortcomings identified in the FEIS, Plaintiffs also satisfied the requirements for fees and expenses under 28 U.S.C. § 2412(d)(1)(A) and N.C.G.S. § 6–19.1. Although Plaintiffs have satisfied the substantive requirements for fees under N.C.G.S. § 6–19.1, the court will request further briefing from Plaintiffs and State Defendants on the issue of Eleventh Amendment immunity before assessing counsel fees against the State.

## ORDER

For the reasons stated in a memorandum opinion entered contemporaneously herewith, Plaintiff shall **RECOVER** attorney's fees and expenses from the Federal Defendants pursuant to 28 U.S.C. §§ 2412(b) and 2412(d)(1)(A) in an amount to be determined. Absent an agreement between the parties in regard to the fee award, Plaintiffs shall **FILE** a supplemental fee petition within twenty (20) days of the date of this order. Upon the filing of such a petition, it is further ordered that Defendants, including the State Defendants, if they wish in anticipation that counsel fees may be ultimately assessed against them, **RESPOND** within twenty (20) days thereafter and **SHOW CAUSE**, if any, why the fees and expenses sought are unreasonable and should not be awarded.

IT IS FURTHER ORDERED that if the State Defendants contend that the Eleventh Amendment to the Constitution of the United States bars an award of counsel fees in this court against them, they shall **FILE** a supplemental brief in support of their position, not to exceed twenty (20) pages, within twenty (20) days of the date of this order. Plaintiffs may file a response brief, also not to exceed twenty (20) pages, within twenty (20) days thereafter. No further briefing will be allowed and no extensions of time will be granted.